This is Joseph Warner and Debra Warner versus Francis Kramer. We have for the appellant, Mercer Turner, and for the appellee, Thomas Portman. Mr. Turner. May it please the court and counsel, it's a wonderful spring day, great view here. Spring fever's got to be really heavy throughout the entire 4th district today and it's St. Patrick's Day, so we'd like to begin by thanking you for the opportunity to present our case and also for providing us with such great weather. I would like to review issues pertaining to expert evidence relative to toxin of cause and then reserve near the end of our argument in chief some discussions about not only why this case is very important to the plaintiffs here but also to the mature male population that has access to modern medicine throughout the world. In this case, the plaintiff's expert is Dr. Alan Newman. At the time, he was a retired physician. He was board certified in internal medicine and oncology, the double board. It's important, both of those are important in this case. The PSA tests are administered or ordered generally by primary care physicians. And the fact that plaintiff's expert in oncology was board certified in internal medicine meant that he had close understanding of what's involved in primary care and the role of the primary care physician in having the PSA test performed for patients. Of course, the oncology board was also an important element of his credentials because this is a case that pertains to cancer and having someone with expertise in that field I think would be essential in a case like this where the cases are indicating, the law of Illinois is indicating that in areas where some specialty is involved, it's important that you have specialists as your experts. And that certainly was the case in this situation. In addition to that, Dr. Newman was also a teacher. He teaches, he's a member of the faculty of the University of California at San Francisco and he is a tutor for interns at a hospital in San Francisco. And I think both of these are important qualifications that indicate how close he is to medicine and contribute to his experience there and contributes to his expertise and qualifications. I think the fact that he's a teacher helps explain the discovery deposition that occurred in here, that occurred in this case and is the sole reason that summary judgment was issued in this case. It's clear that no one really explained to Dr. Newman that he wasn't being treated. No one in our clinic had learned about PSA tests or about prostate cancer. You know, the purpose for his discovery deposition was quite frankly to turn his opinion inside out and to see if they could stand him on his head. Instead, you could tell from the deposition actually what he was doing was treating the attorney that was asking the questions like he was one of his students either in the medical school or a young doctor at the hospital. It's like the expert put his arm around him and tried to explain, you know, what is involved here as though he were in a clinical setting trying to teach a, trying to teach a medical student or a young doctor. And, and so... Mr. Turner, could I just ask a factual question? You bet. How old was your client when he had the 2.2 reading? He started at the age of 50 and so he was at 55. Do these, is there testimony in the record that these numbers vary? For example, if a 60-year-old man were tested, would his numbers automatically be higher than a 55-year-old man? No, there's nothing automatic to any of this and the discussion of the record is relatively clear in that there's, you know, it's impossible to predict the result of a medical test whether it's given in the future or something that may have, should have occurred in the past. There's no one, there's no expert anywhere, there's no doctor or scientist that can predict what that medical test would be. The reason is the circumstances that exist at the time of the test actually determine the outcome of the test. For example, your honor, if, you know, hormones have a great impact on the blood flow in the male prostate. So if, you know, if a patient, for example, had had sex, you know, in close proximity to the time his blood was drawn for the prostate exam, his PSA test score is going to be different than if he hadn't have had sex. And there are a number of things that can influence the, a PSA test. The important thing is, though, that it will be consistent for a person, you know, regardless of age. And if there is some inconsistency in it, then, you know, you don't say, well, in a PSA test they don't work because it's inconsistent. You don't do that. You retest and then you retest and you retest and find out what is going on with this patient and you ask some questions. What were you doing before you got your blood drawn, etc. And you make some sense out of it. Well, I thought one of the experts testified to something being a red flag of sorts, the fact that he was young, did not have an enlarged prostate. Am I incorrect? No. What his expert, what the plant expert said was that, you know, the test score started out at 2.1 and 2.2. When it jumped in to 3.1, based on his age in early 50s, they said at that point, then there should have been retesting that occurred close in time to that period, that the 3.1 by itself wasn't necessarily large enough. Wasn't it incumbent upon Mr. Warner to set up an appointment in 2001 to have this type of routine test, especially given the history? I think it is important that patients are responsible and in this case, I think it's important for the plaintiff, Mr. Warner, to have been responsible. However, that's not an issue in this summary judgment. But I would add, Your Honor, that he was there at the ailments and the opportunity for him to have testing to occur was certainly there. You said that's not an issue for purposes of this summary judgment? No, it's not, no. His, you know, his, whether he was lax or negligent himself was not raised in summary judgment and not discussed or agreed. Wasn't he examined one other time physically for the prostate? Yes, he was. He was given two different types of exams that occurred before 2003 that should have been when PSA tests were given. He was given a, you know, the prostate was felt by the doctor. And at that time, you know, you would want to have both of those occur and it didn't occur. And then another time before 2003, he had his blood drawn and all you'd have to do was check in the... Do you know when that was? It was in 2002. He had his blood drawn and it was not tested. His blood was not tested for its PSA level. What was he in for that time? Your Honor, I cannot recall. At one point there was an appendectomy over that several year period, I think, in either 2001 or 2002. He had a variety of medical concerns. He had gout and, you know, he had common colds. So you say it's in the record that he had his blood drawn in 2002 and the PSA level was not tested? That's correct. And, you know, it's also in the record that at the time when it was finally, the PSA test was finally given in 2003 that, you know, there's a comment by the physician in the record that he has not had his blood drawn in a long time. Well, he actually had it done a year earlier. The reference would be he didn't have his blood drawn and the PSA test administered to the blood that was drawn. Is there a reason that the doctor who examined his prostate is not in this lawsuit? No, the doctor that did examine his prostate is a defendant. Okay, so is that Kramer? Yes. So Dr. Kramer actually felt and did not order a PSA one year? Yes. What year is that? 2002. Mr. Turner, is it correct that according to the defendant's brief that the testimony from one of the experts was that they could not state with a reasonable degree of medical certainty when Mr. Warner's cancer metastasized? That's certainly what the judge concluded from, I guess, his either reading or reading the summary of the discovery deposition and that was the real judge's basis for granting the summary judgment in favor of the defendants. Does your case depend on expert testimony of that nature? No, not at all, and I'd like to discuss that if I may. Having a detailed analysis of molecular and cellular biology in this case isn't needed and it isn't required by Illinois law. There could be metastasizing going on at a very minor level that might not result in even appearing in subsequent scans of other organs or bones or lymph nodes or whatever. And so when it first occurs, it isn't particularly relevant. That's a question of science and detail like that isn't the proper subject matter of a proceeding like this. That's work for medical research and biological research, not the... Then what is the requisite opinion that the expert must give with regard to the language reasonable degree of medical certainty? What is that? Well, the case cited by the defendants here, the Weidenbeck case, discusses that. Now Weidenbeck, in our view, has been taken a little out of context and overused in this case, but there needs to be some factual basis that supports an expert opinion. And in Illinois law, in the development of medical mal cases, what that means is that if you're going to have a cancer case, you need an oncologist or you need a urologist that's experienced or a urological surgeon that's experienced with prostate treatment. And so we had that sort of expert in this case. When an expert opinion needs to be supported by facts, that doesn't mean that there needs to be some scientific analysis where you can watch molecules advance from the prostate to a bone and say, well, this first occurred in 2001 in November, November 12th or whatever. You know, that's not the sort of discussions or analysis that occurs. This is a case that involves expertise in the practice of medicine. And in this case, we're talking about primary care, the standard of care that pertains to the sophistication of analysis of something like this at the molecular and cellular level is way beyond what we should expect of any trial court. Trial courts are needed to administer over cases that involve a wide variety of experts. There are experts involved, engineering experts and appraisers and economists and all sorts of experts that come in front of a trial judge and to say that he has to have this expertise in order to figure these things out is not the state of the law and it should not be. It would put a ridiculous burden. Our trial judges are like primary care physicians and they need to know a little of the facts about a lot of things, but to require them to have an in-depth understanding of science and of the way cancer metastasizes is certainly not required. And it's not required in any cancer case or any case involving human biology. There is no expert that can read the facts and study the charts. What I was trying to get at, I probably didn't phrase it right, I'm not sure I'll do it this time either, but what is the substance of the expert's opinion that gets you past a summary judgment? I mean, what is it that the physician has to say, at minimum, in your estimation? The physician has to say that, you know, I have specialty in this area, in this case cancer. In this case, you know, our specialist had also expertise in primary care. He was double board certified. He has to say, you know, I've looked at the facts which occurred in this case and I've studied those in detail. I know what's involved with the PSA test. And it is my opinion that, what? That based upon a three-year gap in testing his blood for the PSA levels, that that was the cause of the injury to the patient. And that if there had been... And that is my opinion to a reasonable degree of medical certainty. And that is consistent with the science, with the practice, with the statistics. And that was the point I was wanting to reserve for the end of my argument in chief, which is... I'm sorry I missed you. No, no, that's fine. Which is that, you know, this is an extraordinarily important case. And, you know, it not only applies to mature males, but it applies to some races a lot more importantly than it does to other races. There are some races that are much more prone to have aggressive prostate implications when they become mature males than others. And, you know, if we say that PSA testing isn't part of the standard of care, and it's unreliable, and it doesn't mean anything, and if somebody would ever take that seriously, we would damage... do tremendous damage, you know, to a great amount of the mature male population and those that happen to be related to the mature males. The PSA test has entirely changed the scenario on early detection of prostate cancer and on the ability to successfully treat prostate cancer and to improve the life of the patient. And because there wasn't routine prostate testing in this case, you know, that wasn't what occurred here. And it's on that basis that the expert issued his opinion. And we believe that the sort of questions that were asked this expert in his discovery deposition, you know, they really weren't relevant to issues of proximate cause and of standard of care. They were questions that would create confusion and perhaps uncertainty by someone who was trying to get into the underlying science, which is, in my view, inappropriate. Thank you for your time. Thank you, counsel. Mr. Wharton? May I please report? Standard of care is not at issue at this time, correct? That's correct, Your Honor. In their grace, plaintiffs do not dispute any of the facts that set forth in defendants on this appeal. All the facts are not in dispute here. There's nothing that they've contended we've misstated, that we have somehow gotten wrong. Rather, what plaintiffs argue is that the trial court improperly weighed the evidence before the court. That's their argument. Our position is the trial court wasn't weighing any evidence. It wasn't defendants' experts against plaintiffs' experts to weigh evidence. What the trial court properly did was it examined the plaintiff's testimony on proximate cause and found that it was lacking in this particular case. Namely, like Aguilera, Weidenbach, that they did not have a factual predicate for some of their conclusions that they were reaching in connection with their testimony. Plaintiff states, one thing I wanted to point out, plaintiff states that without support of page 8 of his brief, that the court ignored the fact that Mr. Warner was generally cancer free at the beginning of his medical treatment by the defendants. That simply is inaccurate. Dr. Newman testified in his deposition at page 92 that Mr. Warner most likely than not had this cancer in the mid-1990s, 98 or before. Sometimes he indicates 1995. This is a very indolent form of cancer that can sit there for a very long period of time. When did it metastasize? No one knows, Your Honor. Did the doctor testify that it had metastasized in the 90s? He doesn't know. Did he testify no? He says he has no opinion to a reasonable degree of medical certainty as to when metastasis occurred. Doesn't he say that it was more likely to have occurred after 2000? He suggests at one point in time that he thought it was more likely after 2000, but that doesn't get him to his end point because he has to establish that it would have metastasized prior to its diagnosis. He said, I don't know if it metastasized before 2000 or not. He says, I don't know when it metastasized. So if you don't have evidence regarding metastasis, as I will show eventually, that is going to be another flaw. I'm coming off for an opinion that to a reasonable degree of medical certainty it is likely to metastasize after 2000. Wouldn't that be enough? Well, if he says after 2000, it's not going to be enough here because the standard of care purportedly by Dr. Settecase and Dr. Newman is you're supposed to be doing this follow-up testing in March of 2001. So if we do the testing in March of 2001 and presumably a chain of events occur and the diagnosis of cancer is ultimately made, he's still going to have METs before the testing in 2001. So that doesn't get him anywhere because he's got to show that the METs would have occurred at a point in time prior to when we could have diagnosed them. You said there was an error a couple of minutes ago. Right. And I didn't catch where that error was. I'm sorry. Take a look at that. It is on appellant's initial brief at page 8 where they indicated that the court ignored the fact, he's talking about the trial court, ignored the fact that Mr. Warner was generally cancer-free at the beginning of his medical treatment by the defendants. That is inaccurate according to Dr. Newman's testimony. The alleged breach of the standard of care at issue in this case is the purported failure to order a PSA test within one year from Mr. Warner's March 23, 2000 PSA test, which was 3.1. And that's the basis of Dr. Newman's testimony and Dr. Settecase's. You see the jump from 2 to 3.1. That's the red flag that Your Honor referred to earlier on that should have prompted a test within a year. And Dr. Newman testified that the standard of care would not require Dr. Kramer to refer the patient to a urologist for evaluation unless the PSA rose to 4 or above. That's critical to this case. He has to show that the PSA would have been 4 or above, and what that gets you is a referral to a urologist, another specialist. While Dr. Newman concluded that if it would have been 4 or above a year later, the factual predicate for that conclusion was explored in his deposition. And in essence, what Dr. Newman did was he showed me this graph that he had prepared to support his opinions that it would be 4 or above. All he did was he plotted the PSAs over the course of time that Mr. Warner actually had, and he drew a line between them showing, look, it's going up, it's going up. So at this point in time, sometime in 2001, it's going to go over the 4.0 mark. Well, we explored the basis for this. This is nothing more than a graph that any school student could prepare. This is not based on any medical science, any certainty. And I asked him about this graph. I said, well, you know, isn't it true this graph is conjecture? And he's indicated, yes, this graph assumes that there is a constant rate of growth of this cancer. That is conjecture. But he also said this is exactly the kind of graph that you would, or graphing rise, that you would expect to see, particularly when I have the rapid increase and I know when it's 6, and I know when it goes from 2.2 to 3.1, I can graph that because I've got a definitive endpoint. And yes, there is conjecture involved, but he said that's the kind of rise I would expect. Well, that's the kind, what he indicated, it is conjecture. And I asked him, I said, well, if we do this follow-up test, isn't it possible this could be below 3.1? He said, yes, it could be below 3.1. I said, isn't it true that people who have high-grade disease, high cancer, can have very low PSAs? Well, yes, that's true. I said, isn't it true that people who can have high PSAs actually have no cancer? Yes, that's true. In essence, his testimony that this got to 4.0 in 2001, I believe is based on conjecture. Well, if you got the trial and an expert said, it could have metastasized earlier, but we think based on our evaluation that it metastasized after 2000. And then you ask the question, well, what would have happened if it had gone up to 4.0 and it had been tested in 2001? And the answer is he would have been referred to a urologist. And then, well, what would a urologist have found? Either an additional test or an examination might have prompted the earlier delivery of treatment for cancer. And then the question, what's your opinion about whether this would have increased his chance for survival, increased his chances for a favorable outcome, increased his chances for a longer life? And the expert testifies, well, sure, earlier diagnosis is always better. Now, what's wrong with that? Isn't that exactly the testimony that one could expect? No, but in this earlier diagnosis, it's always better. Isn't this the kind of testimony that one could expect based on the hypothetical? The way I phrased it. Am I totally off base, or is that? I think as a plaintiff's counsel, you could bring that in on direct examination of your expert on the stand. Those are the conclusions, and what the cases hold is you can say the conclusions, but if on cross-examination we demonstrate there's not a factual predicate for that, namely I cross him and I say, really, are you telling me you can testify to a reasonable degree of medical certainty when metastasis occurred? And he tells me, no, no one could tell you that. But then he says, but I think it's far more likely that it occurred after such and such a time because, and then it's weighing, isn't it? I don't think it's weighing unless you can testify to a reasonable degree of medical certainty, and that in my mind is the key to this. All of these cases, Weidenbach, Aguilera, talk about can you show to a reasonable degree of medical certainty that the test you're suggesting should have been performed, if that had been performed, that it improved the treatment, that there wasn't a lessening of the effectiveness of the treatment. And Your Honor pointed out, sooner is better than later. That testimony that we reviewed in Aguilera was actually the testimony in that case. You know what? From their experts, sooner is better than later, and the court found that sooner is better than later is not a predicate. We've got to have that expert testimony to a reasonable degree of medical certainty, and the time span is not enough to make that gap. Even if we get over the gap of the 4.0, even if he somehow gets past that that's not speculation, and you're going to have a 4.0 in 2001, which Dr. Settecase testified, their other expert, and Dr. Settecase, for the record, is a family practice physician. He does this kind of testing on a daily basis. He says there's no way you can predict what it's going to be in a year. There's no way you can come up with that, and I don't know anybody who could testify to that. Dr. Newman is actually an oncologist. He stopped practicing primary care in the 1980s. He's an oncologist. These patients are coming to him with a diagnosis of cancer. So even if we get over this hoop, or this hurdle, that you've got to show a 4.0, and we take him there, 4.0 gets you referral to a urologist. That's what they indicate this 4.0 gets you to. Now, what is a urologist going to do? Like some of the cases we have cited, we're left with some speculation about what a urologist is going to do. Is he going to do a biopsy? Or is he going to take a patient who has a 4.0, who has no family history, who has no symptoms of prostate cancer, is he going to take that patient and maybe observe him instead of doing a biopsy? Just like in the cases we've cited, it's speculation what a urologist is going to do with this particular case. The only way we know about that is the standard of care for urologists. Right. Now, we don't have that yet. We don't have that in this case. There's been no testimony from a urologist who said, you know what, if you had referred him to me with a 4.0, I would have done a biopsy, and I would have followed him up, and that would have resulted in a surgery. So that's the second hurdle on proximate cause that we believe they've stumbled over. 4.0, what's a urologist going to do? And then the final hurdle is metastasis. Let me ask you a question. Sure. Don't you find it ironic that your defense is speculation, and the reason we're speculating what his PSAs were for those years is because your client did not administer the PSA? The PSAs are performed on annual physical exams, like every screening exam. When you get a colorectal screening, you get a PSA screening. When you come in for your annual physical exam, there's no requirement that people present themselves for their annual physical exams. I thought Mr. Turner said your client actually examined Mr. Kramer, or Mr. Warner, and did not order a PSA during this time period. I don't know that that's true or not. I can't remember back through the medical records whether she... Someone examined him. I didn't remember whether it was your client. You're right. There is no question that he presented to Carl Clinic Association with items like maybe an ankle injury or gout or something like that. But are you disputing Mr. Turner's statement that in 2002 your client had blood drawn from the patient and didn't check the PSA level? I don't know if that's true or not. Do you think it's significant that that is true? I don't think it's significant. It could potentially relate to issues involving standard of care, whether you should have done that at that point in time. But a blood draw for a CBC because you've got an infection that doesn't check a PSA, I don't know that she did that or not. I can't answer that question. That, as I understand, is not in the record on appeal. But those issues would relate to standard of care. Okay. So that's not in the record? I don't believe that all the medical records are contained within the record. I know that we have indicated that a prostate exam was done in 2002 that was normal. And that comes in through Dr. Newman's testimony. The final hurdle with respect to proximate cause is this issue of metastasis. And it's a critical issue because of survivability. According to Dr. Newman, if you have meds, you are at stage four. It is not a curable cancer. There is no opinion to a reasonable degree of medical certainty as to when metastasis occurred. It could have been before 2000, just as likely as after that. There is no showing that a delay from 2001 to 2003 lessened the effectiveness of the treatment. All we're left with is this time period. There's no testimony that this delay lessened the effectiveness of the treatment. It's just as likely he would have received the same treatment with the same prognosis. As the court indicated in Aguilera, sooner is better is not sufficient to establish proximate cause. Counsel in his arguments indicated that no one can predict what the PSA test would be. That's exactly our point. This is not a predictable test. You can't predict what someone's PSA is going to be within a year. We think our case falls squarely within Weidenbach, within Aguilera. We believe the plaintiff has failed to establish by expert testimony to a reasonable degree of medical certainty that the purported delay lessened the effectiveness of any treatment. We believe there are three fatal hurdles for him to jump over. One is that the PSA test of four would have yielded a four if performed in March of 2001. The second one is a four gets you referred to a urologist. There's no testimony from a urologist as to what he would have done with this patient with this presentation. The final argument is that there is no testimony to a reasonable degree as to when metastasis occurred. That means there is no testimony establishing to a reasonable degree of medical certainty that the purported delay in diagnosis lessened the effectiveness of the treatment. It wasn't established in Dr. Newman's testimony. We filed a summary judgment. There was no affidavit submitted by Dr. Newman to try to explain or provide a factual predicate for this testimony. Accordingly, we would ask that the court affirm the entry of summary judgment. Thank you, Counsel. Rebuttal. May it please the Court, I'd like to go over several points if I could have the opportunity. This case is about the standard of care because if you decide there is insufficient evidence of approximate cause, you've wiped out the standard of care. There is no standard of care regarding PSA testing. You are ruling that PSA testing is so unreliable that really there is no standard of care on it. So it's both a standard of care and approximate cause case. Neither Aguilera or Weidenbach stand for the propositions which they are presented to you in this case. Neither of them have anything to do at all with a factual predicate for an expert opinion. What they have to do with, both of them have to do with, is having an expert in the field of medicine that's essential to explain what occurred with the patient and why a different course of treatment or following the standard of care would have been better in that case. It has nothing to do with some underlying factual predicates. It had to do with the qualifications of the expert, both Aguilera and Weidenbach. There is no discussion, there's no reference at all to any underlying facts other than the qualifications of the expert. And it just so happens that in both of those cases, there was a big hole in the sort of experts that were provided. And in both of those cases, you know, the physicians that were there were not experts in the appropriate field. And both of them said, you know, really, I don't really know what would happen in that field, because I'm not a specialist in that field and you need to get one. And so I think they do not stand for the propositions that are presented in this case. And the appellate court that decided both Aguilera and Weidenbach is now not following either of those cases on review. And what Aguilera and Weidenbach did was it caused at trial level some judges to become scientists, like I've indicated occurred in this case. And the appellate court that decided both of those cases has since in two cases that are cited in our brief said, listen, there are qualified experts in these cases and so their decision will be affirmed and the decision should not have been touched by the trial court because of the trial court engaging in some scientific analysis, often its own, like occurred in the incident case. Now, the record shows that there was a physical exam with the index finger of the doctor in 2002. It's on page 197. Page 197 and this is Dr. Kramer? Kramer. And that there was blood drawn, but not a PSA ordered in 2002 on pages 388 and 455 of the record. I see that my time has expired. Let me just finish one thought if I might. You have until it's read. Oh, I do? Okay. Let me indicate that the discovery deposition has been taken entirely out of contest. This expert thought he needed to educate the lawyer that was examining him about what was involved in this. And this graph that he put together wasn't intended for a publication in a medical journal or for presentation in a textbook or as an official exhibit at a trial. He was just trying to help the lawyer understand that typically in a human being that there's a pattern to a PSA test. And if it doesn't follow a certain pattern, there's an explanation for it. As I indicated, there's these external things that can influence it. So you ask the questions, you find out what has happened to the patient, and you retest. And you don't have to wait six months to retest. You can retest the following week and have some instructions for the patient about what kind of conduct it should have before it gets retested. And it should help stabilize the results of the PSA test, which has been a remarkable improvement and has created a remarkable improvement in treatment of mature males. And it would be a shame to have this case decided on the basis that it is not a reliable test and not dependable enough to create proximate cause. In 2002, in the record of 388 and 455, was that blood drawn on the order of Dr. Kramer? No. On that day, when the finger exam was given, that was Dr. Kramer doing that. When the blood was drawn, it was a substitute doctor at the Carl facility in Rantoul. Thank you. Mr. Turner? Yes. I noticed that you had a small section in the brief regarding the origin of the word straw man. Mm-hmm. Where and when did you learn about that? From Sidley and Austin. That appears in a lot of their legal briefs, because they continually accuse counsel of doing stuff like that. And I copied it from Sidley and Austin. Thank you. Thank you, counsel. Thank you. This matter under advisement.